DECISION
{¶ 1} Relator, Frank Irwin, Jr., has filed an original action in mandamus requesting this court to issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying him temporary total disability ("TTD") compensation, and to enter an order granting such compensation. *Page 2 
 {¶ 2} This court referred this matter to a magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court deny the requested writ. (Attached as Appendix A.) No party objected to the magistrate's findings of fact, and we adopt them as our own.
 {¶ 3} In brief, relator suffered a work-related injury on December 12, 2001, and a claim was allowed for lumbosacral sprain, arms/shoulders bilateral sprain, and neck sprain. Relator first began treatment on October 21, 2004, with Dr. John A. Walter. Additional claims were allowed in December 2004 and July 2005.
 {¶ 4} In July 2005, Dr. Walter certified a period of TTD beginning October 21, 2004, and relator moved for TTD compensation beginning on that date. Dr. Scott E. Singer also examined relator, and Dr. Singer concluded that the medical evidence did not support the period of disability requested.
 {¶ 5} Dr. Walter issued a letter to relator in September 2005, indicating that he would no longer act as relator's physician. The letter also states: "This comes after your threatening and abusive behavior toward my staff, as well as your comment referring to use of illegal substances, which is a violation of your pain management agreement."
 {¶ 6} In October 2005, Dr. John W. Bell, upon completing a physician drug review, found no "reasonable, nor appropriate documentation for neurogenic pain to support" numerous pain medications prescribed to relator. The report also noted Dr. Walter's September 2005 letter.
 {¶ 7} Following an October 14, 2005 hearing, a district hearing officer ("DHO") denied TTD compensation, citing Dr. Singer's report. Following a November 17, 2005 *Page 3 
hearing, a staff hearing officer ("SHO") affirmed the DHO's order. The SHO's order referenced Dr. Singer's report, Dr. Bell's drug review, and Dr. Walter's letter. "Taking these factors together," the SHO found that "the weight of the evidence does support the conclusions in Dr. Singer's report."
 {¶ 8} Relator filed this original action, and the magistrate recommended a denial of the requested writ. The magistrate concluded that neither Dr. Singer's report nor Dr. Bell's drug review constitutes some evidence upon which the commission could rely to deny compensation. However, the magistrate concluded that Dr. Walter's letter did provide a valid basis for denying compensation.
 {¶ 9} In his objection to the magistrate's decision, relator notes his agreement with the magistrate's conclusion that neither Dr. Singer's report nor Dr. Bell's drug review constitutes some evidence on which the commission could rely to deny compensation. The commission did not respond to relator's arguments in this respect, nor did the commission submit objections to these conclusions of the magistrate. Based on our independent review, we agree with the magistrate's conclusions of law concerning Dr. Singer's report and Dr. Bell's drug review, and we adopt such conclusions as our own.
 {¶ 10} However, relator asserts that the magistrate improperly relied on Dr. Walter's September 2005 letter to deny TTD compensation. We turn to the letter.
 {¶ 11} Dr. Walter's letter is dated September 21, 2005. However, the letter contains a handwritten notation indicating that it should have been dated September 27, 2005, as well as a certified mail receipt with a notation "mailed 9-28." The record also contains an office note from September 23, 2005, and an operative note from a steroid *Page 4 
injection performed on September 26, 2005. Thus, we conclude that Dr. Walter wrote the letter on September 27, 2005. The complete contents of that letter are as follows:
 Dear Mr. Irwin:
 This letter is to notify you that I will no longer be your physician as I feel we have been unable to maintain a satisfactory physician-patient relationship. This comes after your threatening and abusive behavior toward my staff, as well as your comment referring to use of illegal substances, which is a violation of your pain management agreement. As such, I feel that there is nothing more with which I can assist you.
 You now have 30 days from the date of this letter to find another physician to assume your care. Any future appointments you may have had at this office have been cancelled.
 If you need assistance finding another physician, please check with your insurance company, local telephone directory, or family physician.
 Sincerely, [signature] John A. Walter, D.O.
 {¶ 12} The SHO's order referenced Dr. Walter's letter in two respects. The SHO "note[d] that the claimant has not been treated since 09/26/2005, when he was released from the care of Dr. Walter, because Dr. Walter felt he could no longer treat the claimant because of disagreements." The SHO considered Dr. Singer's report and Dr. Bell's drug review. The SHO also found: "Additionally, the claimant's discharge from care was due to taking unrelated medications which may interfere with his treatment." "Taking these factors together," the SHO found that "the weight of the evidence does support the conclusions in Dr. Singer's report."
 {¶ 13} In our view, these references do not clearly define the impact of Dr. Walter's letter upon the SHO's review. We cannot determine whether the SHO rejected *Page 5 
Dr. Walter's TTD certification because relator's use of "unrelated medications" undermined Dr. Walter's treatment. Nor can we determine the impact of Dr. Walter's letter upon the SHO's reliance on Dr. Singer's report. Thus, we do not agree with the magistrate's findings concerning the SHO's order in this respect, and we sustain relator's objection.
 {¶ 14} Having eliminated Dr. Singer's report and Dr. Bell's drug review as evidence to support an award of TTD compensation, relator asserts that a writ ordering compensation should issue. We disagree. The SHO's findings regarding Dr. Walter's letter lack the clarity necessary for the granting of a writ ordering compensation. Instead, reconsideration of relator's motion for TTD compensation, without consideration of Dr. Singer's report and Dr. Bell's drug review, is necessary.
 {¶ 15} For all of these reasons, based on an independent review of this matter, we adopt the magistrate's findings of fact and conclusions of law, except as we have indicated. We issue a limited writ ordering the commission to adjudicate relator's motion for TTD compensation in a manner consistent with this decision.
Objection sustained, limited writ of mandamus granted.
 SADLER, P.J., concurs. KLATT, J., dissents.
APPENDIX A
 MAGISTRATE'S DECISION {¶ 17} In this original action, relator, Frank Irwin, Jr., requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him temporary total disability ("TTD") compensation beginning October 21, 2004, and to enter an order granting said compensation. *Page 7 
 Findings of Fact:
 {¶ 18} 1. On December 12, 2001, relator sustained an industrial injury. On that date, relator fell out of the back of a truck where he was pulling on something that snapped loose. The employer is a state-fund employer.
 {¶ 19} 2. The industrial injury was initially allowed by the Ohio Bureau of Workers' Compensation ("bureau") for the following conditions:
ICD-9 Code Description
846.0 Sprain lumbosacral
840.9 Bilateral sprain arms/shoulders
847.0 Sprain of neck
 {¶ 20} 3. On October 21, 2004, relator was initially examined by John A. Walter, D.O., who wrote:
 * * * He has been having rather significant amounts of neck and right shoulder pain since his injury happened in 2001. Generally, on a daily basis, his pain is between 8-9/10. He reports that when he was receiving some pain medication his pain would be approximately a level of 410;. He often does have headaches associated with the neck pain and had used Maxalt in the past, which had been somewhat helpful for him. He notes that at present, the medications he had been on, as well as sleeping giving some relief from pain. Otherwise, when he is up and active at all he is generally in some type of constant aching pain throughout the neck, shoulder, and low back. He does occasionally get pain from the right low back, into the right buttock and down the left leg. His neck pain generally stays within the neck and the right trapezius and right shoulder and he really denies any true pain referring down into the right upper limb. He briefly had physical therapy shortly after his injury but has not had anything recently. He reports that his present level of pain permits him from really doing any daily activities and reports that he is unable to work, due to the significant amount of pain and tightness that he generally experiences.
 * * * *Page 8 
 PHYSICAL EXAMINATION: * * * He does have slow transitions from a seated to standing position. He utilizes a straight cane for mobility assistance. Cervical range of motion shows flexion to approximately 50° and extension to 20°. Rotation is to approximately 70° bilaterally. Spurling maneuver is negative for radicular pattern but does produce axial cervical pain. Lumbar range of motion shows flexion to approximately 30° and extension to a few degrees past neutral. He notes that extension is particularly problematic for him. There is tenderness to palpation over the cervical midline spine and the cervical strap muscles on the right side, as well as the right trapezius. There is tenderness of the lumbosacral junction, particularly on the right side and of note over the right SI joints. Less tenderness is noted over the sciatic notch and over the greater trochanters on the right side. Knee examination shows some crepitus with range of motion bilaterally, but appears to have good stability and no evidence of laxity on either side. Shoulder examination shows no impingement sign bilaterally. There is some pain in the right posterior shoulder musculature with internal/external rotation. He has a negative Speed's and a negative empty can test on the right side. Reflexes are 2+ throughout the upper and lower limbs bilaterally. He has a negative Hoffman signs bilaterally. Toes are downgoing bilaterally and there is no ankle clonus. He has good pedal pulses bilaterally. Strength examination shows some weakness with regards to right shoulder abduction, as well as the right triceps, but this appears to be somewhat related to pain inhibition. He has good biceps strength, good wrist extension, and good hand intrinsic strength on the right side. There is some trace weakness with regards to the grip strength on the right side. Left upper limbs shows 55 strength. There is 55 strength throughout the lower limbs bilaterally. Seated and supine straight leg maneuver produces low back pain, but no clear radicular pattern at this point. He also has pain in the low back with Faber maneuver bilaterally but it is most painful on the right buttock region.
 * * *
 RECOMMENDATIONS: At this time, I would like to request SI joint injections as he is particularly tender over the right SI joint and I believe this may be particularly helpful with regards to some of his low back complaints. I will also submit request for MRI imaging of the cervical and lumbar spines. Furthermore, we will also request physical therapy with a *Page 9 
TNS trial to address both the cervical and lumbar spine and see if we can provide him with some additional relief from this standpoint. I have also provided him with prescriptions for Bextra 20 mg q day, Neurontin 300 mg t.i.d. to be titrated up to this over the course of 2 weeks, Skelaxin 800 mg t.i.d. prn, and Lidoderm patch 5% 1-3 topically on for 12 hours/off for 12 hours. I also provided her [sic] with a prescription for Ultram 50 mg 1 every 6 hours as needed for pain. I explained to him that these medications in working in conjunction, often are beneficial and should provide him with some meaningful relief. We will submit the request for additional treatment and I will plan on seeing him back in follow up in approximately 4-6 weeks. At that time, we will plan for interventional procedures and physical therapy, if we have approval.
 {¶ 21} 4. On December 3, 2004, relator returned to Dr. Walter for examination and treatment. Dr. Walter wrote:
 * * * Since I had seen him last, he is reporting that the Lidoderm, Neurontin, Skelaxin, and Maxalt have been particularly helpful, and have helped to significantly reduce some of his headaches as well as decrease the pain that he was experiencing down the leg. He did have some concerns regarding Bextra but has continued to take these. Ultram has been somewhat helpful but he has not noticed an extreme difference in his level of pain. Today he reports that his pain is about a 4/10 with medications. He does report that the spasms throughout his neck, arms, and legs have gotten much better. He still reports that he is not sleeping well at this point. He continues to report some numbness in his arms as well as his legs. He continues to report pain throughout the neck into the shoulders, and the low back and then down into the legs, particularly, on the right side. He also is noting a significant amount of right shoulder pain with any significant amount of activity or movement. He denies any new symptoms with regards to his neck, shoulder, and back pain. * * *
 * * *
 PHYSICAL EXAMINATION: He is alert, oriented, pleasant, and in no acute distress. He continues to have slow transitions. He has tenderness to palpation of the anterior and superior aspect of the right shoulder. He has a positive *Page 10 
Speed's test, negative Hawkins-Kennedy Maneuver. He has 2+ reflexes throughout the upper and lower limbs with the exception of the Achilles, which is 1+ bilaterally. Strength shows 55 strength throughout the upper limbs and lower limbs with the exception of some weakness with regards to right shoulder abduction. He does have some weakness with regards to grip strength on the right side as well. There continues to be significant tenderness over the right lumbosacral region and particularly over the right sacroiliac joint as he has a positive jump sign with palpation over this area.
 * * *
 COMMENTS: At this time, I have provided him with refills of his Maxalt, Lidoderm, Neurontin, Skelaxin, and Pepcid. These have all been helpful for him. We will have him discontinue the Bextra and I provided him with a prescription for Naproxen 500 mg b.i.d.. I also provided him with a prescription for Cymbalta 60 mg q.h.s. to help with some of his leg symptoms. Furthermore, I did provide him with a prescription for Colace as well as Ultram as he is having some constipation in light of his medications. I instructed him that he may take 1-2 Ultram every six hours as needed. We will also submit for allowance to perform right shoulder injections as I do believe he is having an increase in the amount of symptoms regarding his right shoulder. I believe shoulder injections would be quite beneficial for him. In addition, we will also submit for an additional allowance 846.1 sacroiliac sprain, as he is quite tender over this region and falling on his right buttock is a consistent mechanism of injury. Furthermore, he has never had any treatment to this region and I think it should be addressed, and I would hope that we would be able to treat it with possible joint injections, if we are successful in having this amended to his claim. * * *
 {¶ 22} 5. In an order mailed December 27, 2004, the bureau additionally allowed the claim for:
840.9 Sprain shoulder/arm NOS-Right
846.1 Sprain sacroiliac
 {¶ 23} 6. On February 25, 2005, relator returned to Dr. Walter for examination and treatment. Dr. Walter wrote: *Page 11 
 * * * He had previously been trialed on Sonata and Ambien and has not found these too helpful with sleep. Recently I had called in a prescription for Trazodone and he has taken up to four of these and still is not able to sleep. He does inform me that his daughter had given him some Xanax and actually he had found that he was able to sleep for several hours with that. He is continuing to take the Neurontin and is tolerating this. * * *
 * * *
 * * * I will have him continue his present medications. We will have him discontinue the Skelaxin, however. I did provide him with a prescription for Valium 10 mg b.i.d. to see if we can provide him with some better relief from his muscles spasms and also improve his overall sleep pattern, as we have tried multiple other sleep aides. * * *
 {¶ 24} 7. On March 24, 2005, relator underwent an MRI of the lumbosacral spine. The radiologist reported:
 Impression:
 [One] Mild degenerative change in the L5-S1 disc with relative [illegible] central and left sided posterior protrusion of the disc.
 [Two] Moderate degenerative change in the L4-5 disc with mild broad based posterior bulge of the disc.
 {¶ 25} 8. On April 1, 2005, relator returned to Dr. Walter for examination and treatment. Dr. Walter wrote:
 * * * He reports that overall the present medications are providing him with some overall relief. He does continue to have some rather significant discomfort in the right lateral and posterior neck region as well as into the right shoulder. He has some continued discomfort in the lumbosacral region. * * * He notes that he is sleeping better since we have placed him on Valium and presently he has increased this to 3x a day and finds this to be relatively helpful. He continues to report some numbness of the medial ankles bilaterally, but reports there are no other change. * * * He *Page 12 
also reports rather frequent headaches secondary to his significant neck stiffness.
 PHYSICAL EXAMINATION: He is alert, oriented, and pleasant. In no acute distress. He has 2+ reflexes at the knees, 1+ at the ankles. Reflexes are intact throughout the upper limbs. Light touch sensation is intact throughout the upper and lower limbs with exception of decreased sensation over the right and left medial ankles. He has cervical flexion to 30° and extension to 20° . This is particularly painful for him. There is tenderness of the cervical paraspinals and over the right and left trapezius. He has positive impingement signs on the right with shoulder ROM. He does have a positive Hawkins maneuver as well. He has a positive empty can test and a positive Speed's test, but appears to be more neck pain with Speed's test. There is some tenderness to palpation of the right shoulder region both anteriorly and posteriorly.
 * * *
 PROCEDURE: * * * I injected 1 cc of 1% Lidocaine and 2 cc of Kenalog into the right subacromial space. The patient tolerated the procedure well and there were no complications. * * *
 * * * I will also have him continue with his present medications and did provide him with refills for Ultram, Skelaxin, Colace, Pepcid, Lidoderm and Neurontin 600 mg 1 TID. I also will have him discontinue the Naproxen, we will replace this with Mobic 15 mg QD. He is not presently due for Valium, but will call when he needs a refill on this. * * * We will also request for cervical trigger point injections to see if we can decrease some of the discomfort that he experiences in the cervical paraspinals and into the trapezius, particularly on the right side.
 {¶ 26} 9. On form C-9 dated April 1, 2005, Dr. Walter requested approval for a series of three cervical trigger point injections. The C-9 request was approved.
 {¶ 27} 10. On May 13, 2005, relator returned to Dr. Walter for examination and treatment. Dr. Walter wrote: *Page 13 
 * * * We have received approval for trigger point injections and he is requesting a trial of these today. * * *
 * * *
 PROCEDURE: After explaining the risks/benefits of the procedure, I identified 4 trigger points in the right trapezius and scalenes. I then injected 2.5 cc of 1% Lidocaine into each of these trigger points. Then I used soft tissue stretching techniques to try to decrease some of the hypertonicity. The patient tolerated the procedure well.
 {¶ 28} 11. On July 15, 2005, relator returned to Dr. Walter for examination and treatment. Dr. Walter wrote:
 * * * Since I had last seen him, he informs me that he was recently admitted to Fairfield Medical Center for overdosing on Phenobarbital. He is also reporting that he has been quite depressed for sometime and never really has relayed that to me on previous visits. He unfortunately, was also jailed as a result of some disorderly conduct which did stem from his recent substance abuse. He does report that the previous trigger point injections were quite beneficial with his right neck and shoulder pain. He does find the Lidoderm to be particularly beneficial, as well. * * * He does get numbness in the legs at times. There is no weakness. He does note that the Neurontin is sometimes helpful with controlling his leg symptoms but not all the time.
 * * *
 PHYSICAL EXAMINATION: He is alert, oriented, and pleasant, no acute distress. He has tenderness of the right cervical paraspinals and throughout the trapezius and the rhomboid regions. He does make good eye contact. He is accompanied by his daughter today. Strength appears to be functional. He walks with a slightly antalgic gait pattern and does utilize a cane for assistance with mobility.
 PROCEDURE: After explaining the risks and benefits of the procedure, I noted four trigger points in the right trapezius, scanlines, and rhomboids. I then injected 3 cc of 1% Lidocaine into each of these four trigger points forming a small wheal, then utilized soft tissue stretching and compression to alleviate some of the hypertonicity. The patient tolerated the procedure well. * * * *Page 14 
 * * *
 COMMENTS: I advised him to continue to seek assistance with his psychological issues. I will make a request to have his claim allowed for adjustment reaction/depression (309.1) as I do think much of this can be related to his inability to work. We will also make a request for further trigger point injections, as he has found these to be helpful. I will have him decrease his Neurontin to 600 mg t.i.d., with instructions to further titrate to once nightly starting next week, and then the week following, he is to drop the Neurontin altogether. In the meantime, we will have him start Zonegran 100 mg q.h.s.. I will plan on seeing him back in four to six weeks.
 * * *
 {¶ 29} 12. In an order mailed July 20, 2005, the bureau additionally allowed the claim for "degenerative disc disease L4-5 and L5-S1." The additional claim allowance was identified under ICD-9 code 722.52.
 {¶ 30} 13. On July 28, 2005, Dr. Walter completed a C-84 on which he certified a period of TTD beginning October 21, 2004 to an estimated return-to-work date of September 27, 2005.
 {¶ 31} The C-84 form asks the physician to: "List ICD-9 Codes with narrative diagnosis(es) for allowed conditions being treated which prevent return to work." In response, Dr. Walter listed the following ICD-9 codes: "846.0, 840.9, 847.0, 846.1 [and] 722.52."
 {¶ 32} 14. On July 29, 2005, relator moved for TTD compensation beginning October 21, 2004.
 {¶ 33} 15. Relator's motion prompted the bureau to request a "Physician Review" from Scott E. Singer, M.D. The physician review is completed on a MEDCO-21 *Page 15 
form and contains two parts. In this instance, the first part was apparently completed by a bureau nurse. She listed the following allowed conditions:
 846.0 Lumbosacral Strain
 840.9 Bilateral Shoulder Strain
 847.0 Cervical Strain
 722.52 DDD @ L4-5, L5-S1
 The first part of the form further reads:
 Question(s) to be addressed:
 [One] Based on medical evidence is the requested [period of disability] 10/21/04 to present and to continue sufficiently] supported?
 [Two] Would the allowance of a new condition (DDD @ 4-5, L5-S1 ) be sufficient to support the [period of disability]?
 {¶ 34} The second part of the form is the "Physician's Narrative." Dr. Singer wrote:
 Analysis: I accept the allowed conditions in this claim and the objective findings of the examining physicians. [Date of injury] is 12/12/01. [Injured worker] was initially treated by Dr. Dorgan. Since 10/21/04, he has been receiving ongoing care from Dr. Walter that has included multiple medications and serial trigger point injections. Beyond, the initial evaluation performed on 10/21/04, Dr. Walter has documented very few objective findings on [physical examination]. Most of his documented findings are subjective in nature.
 Conclusion: Based on the analysis above, it is my opinion, with[in] a reasonable degree of medical certainty, that the weight of the medical evidence in the file does not support the [period of disability] in question. This opinion is based upon the lack of significant objective findings reported by the [physician of record].
 {¶ 35} 16. On September 26, 2005, relator underwent a fluoroscopic guided right L5-S1 transforaminal epidural steroid injection which was preformed by Dr. Walter. Dr. Walter's operative report explaining this procedure is contained in the stipulated record. *Page 16 
 {¶ 36} 17. The record contains a letter from Dr. Walter to relator dated September 21, 2005. (The letter also contains a handwritten notation stating that the letter "should have been dated 9-27-05.") The letter states:
 This letter is to notify you that I will no longer be your physician as I feel we have been unable to maintain a satisfactory physician-patient relationship. This comes after your threatening and abusive behavior toward my staff, as well as your comment referring to use of illegal substances, which is a violation of your pain management agreement. As such, I feel that there is nothing more with which I can assist you.
 {¶ 37} 18. On October 6, 2005, the bureau requested a physician drug review which was completed by John W. Bell, M.D., on October 21, 2005. Dr. Bell reported:
 Conclusion-
 Data Warehouse 8-04 into 8-05 notes (6) drug classes. Medical cannot find any reasonable, nor appropriate documentation for neurogenic pain to support (H4C) anti convulsant, zonegran; nor, (H3F) anti migraine, maxalt; nor, (D4K) gastric acid reducer, ranitidine; nor, (H2W), JCA phenothiazine, amitripyline — ALL, inappropriate for given allowances.
 Medical supports NSAIDS, (S2B), ibuprofin (H6H) skeletal muscle relaxant, methocarbamol as both reasonable and appropriate.
 Again, a prudent observer would note the 9-21-05 letter from POR/ JW PM/R advising that this POR had severed physician-patient relationship due to: "threatening abusive behavior towards his staff, and use of illegal substance". Therefore, there should be further BWC drug review in 6+ months to check on appropriateness of meds.
(Emphasis sic.) *Page 17 
 {¶ 38} 19. Following an October 14, 2005 hearing, a district hearing officer ("DHO") issued an order denying relator's motion for TTD compensation. The DHO's order explains:
 The District Hearing Officer denies temporary total disability compensation from 10/21/2004 to today's date 10/14/2005. The District Hearing Officer finds that the allowed conditions did not render Mr. Erwin [sic] temporarily and totally disabled. This finding is based upon the 09/13/2005 review from Dr. Singer. Additionally, the District Hearing Officer notes that Mr. Erwin [sic] has not received temporary total disability compensation. While the District Hearing Officer notes that this claim was additionally allowed on 12/27/2004 and again on 07/20/2005, the District Hearing Officer agrees with the opinion of Dr. Singer that there is insufficient evidence to support the payment of temporary total disability compensation.
 {¶ 39} 20. Relator administratively appealed the DHO's order of October 14, 2005.
 {¶ 40} 21. Following a November 17, 2005 hearing, a staff hearing officer ("SHO") issued an order affirming the DHO's order. The SHO's order explains:
 Temporary total disability compensation remains denied for the period 10/21/2004 through 10/14/2005, the date of the district hearing. The Staff Hearing Officer notes that the claimant has not been treated since 09/26/2005, when he was released from the care of Dr. Walter, because Dr. Walter felt he could no longer treat the claimant because of disagreements. The Staff Hearing Officer relies upon the 09/13/2005 review from Dr. Singer for the denial of the requested period of compensation. Dr. Singer reviewed the evidence of record and included [sic] that it would not support the payment of temporary total disability compensation.
 After consideration of the arguments of counsel at hearing and a review of record, the Staff Hearing Officer concurs with the conclusions contained in Dr. Singer's report. Not withstanding [sic] the additional allowances as which have been in the claim over the last year, the compensation is not *Page 18 
supported by the record. It is not adequately demonstrated that the claimant's disabled presentation to his treating physician was attributable to the conditions allowed in the claim, including the newly allowed conditions. A recent medication review found the claimant to be taking a number of medications unrelated to the allowed conditions in the claim. Additionally, the claimant's discharge from care was due to taking unrelated medications which may interfere with his treatment. Taking these factors together, the Staff Hearing Officer finds the weight of the evidence does support the conclusions in Dr. Singer's report.
 {¶ 41} 22. On December 10, 2005, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of November 17, 2005.
 {¶ 42} 23. On March 8, 2006, relator, Frank Irwin, Jr., filed this mandamus action.
Conclusions of Law:
 {¶ 43} The SHO's order of November 17, 2005, discloses three bases for the commission's denial of TTD compensation: (1) Dr. Singer's September 13, 2005 review; (2) the so-called "recent medication review" which is an apparent reference to Dr. Bell's October 21, 2005 drug review; and (3) relator's "discharge" from Dr. Walter's care.
 {¶ 44} Based upon the foregoing, three issues are presented: (1) does Dr. Singer's report constitute some evidence upon which the commission can rely; (2) does Dr. Bell's drug review constitute some evidence upon which the commission can rely; and (3) does relator's "discharge" from Dr. Walter's care provide a valid basis for rejecting Dr. Walter's C-84 certification of TTD?
 {¶ 45} The magistrate finds: (1) Dr. Singer's report does not constitute some evidence upon which the commission can rely; (2) Dr. Bell's drug review does not constitute some evidence upon which the commission can rely; and (3) relator's *Page 19 
"discharge" from Dr. Walter's care does provide a valid basis for rejecting Dr. Walter's C-84 certification of TTD.
 {¶ 46} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 47} Turning to the first issue, Dr. Walter's C-84 lists five ICD-9 codes for the allowed conditions being treated which prevent a return to work. Among the five codes listed is 846.1 which is the code for sprain sacroiliac.
 {¶ 48} On Dr. Singer's review, the bureau failed to list 846.1 sprain sacroiliac as an allowed condition. In his "Physician's Narrative," Dr. Singer states that he accepts "the allowed conditions in this claim." However, Dr. Singer does not indicate that he recognized the bureau's failure to list 846.1 sprain sacroiliac as an allowed condition. Accordingly, the presumption is that Dr. Singer was unaware that the industrial claim had been allowed for sprain sacroiliac.
 {¶ 49} Dr. Singer's presumed unawareness of an allowed condition fatally flaws his September 13, 2005 review. This magistrate cannot second-guess what impact this unawareness may have had on Dr. Singer's conclusion. Dr. Singer's analysis of the medical evidence was flawed at the outset because Dr. Singer failed to review for an allowed condition that relator's physician relied upon to certify disability. Thus, Dr. Singer's report cannot support the commission's denial of the request for TTD compensation. State ex rel. Richardson v. Quarto Mining Co.
(1995), 73 Ohio St.3d 358. *Page 20 
 {¶ 50} The second issued, as previously noted, is whether Dr. Bell's drug review constitutes some evidence upon which the commission can rely to deny TTD compensation.
 {¶ 51} Dr. Bell concluded that some of the medications being prescribed by Dr. Walter were inappropriate for the claim allowances.
 {¶ 52} For example, Dr. Bell concluded that an anti-convulsant, Zonegran, was an inappropriate drug to prescribe for the allowed conditions of the claim. The magistrate notes that Dr. Walter's July 15, 2005 office note states that relator will be started on "Zonegran 100 mg q.h.s."
 {¶ 53} For another example, Dr. Bell concluded that a "gastric acid reducer, ranitidine," was an inappropriate drug to prescribe for the allowed conditions of the claim. The magistrate notes that Dr. Walter's April 1, 2005 office note states that relator was given "Pepcid."
 {¶ 54} For another example, Dr. Bell concluded that the "anti migraine, maxalt," was an inappropriate drug to prescribe for the allowed conditions of the claim. The magistrate notes that Dr. Walter's April 1, 2005 office note states that relator "reports rather frequent headaches secondary to his significant neck stiffness." In that same office note, Dr. Walter states that "Maxalt" is among the medications being prescribed.
 {¶ 55} How does the taking of medications unrelated to the allowed conditions detract from the reliability of Dr. Walter's certification of TTD? Dr. Bell's October 21, 2005 report provides no answer, nor does the SHO's order of November 17, 2005.
 {¶ 56} Nonallowed conditions cannot be used to advance or defeat a claim for compensation. State ex rel. Waddle v. Indus. Comm. (1993),67 Ohio St.3d 452. *Page 21 
Likewise, the taking of medication for a nonallowed condition cannot be used to advance or defeat a claim for compensation. Id.
 {¶ 57} In the absence of an explanation from Dr. Bell or the commission as to how relator's taking of the medications identified by Dr. Bell as inappropriate for the allowed conditions, the taking of those medications clearly cannot defeat relator's claim for TTD compensation. Waddle.
 {¶ 58} The third issue is perhaps the more difficult of the three issues addressed here.
 {¶ 59} The SHO's order of November 17, 2005 states: "Additionally, the claimant's discharge from care was due to taking unrelated medications which may interfere with his treatment."
 {¶ 60} In his September 21, 2005 letter to relator, Dr. Walter ends the physician relationship, explaining: "This comes after your threatening and abusive behavior toward my staff, as well as your comment referring to use of illegal substances, which is a violation of your pain management agreement."
 {¶ 61} Presumably, the SHO's reference to "unrelated medications" is a reference to the "illegal substances" that Dr. Walter addressed in his so-called "discharge" letter.
 {¶ 62} Relator's admitting to the use of illegal substances that, in Dr. Walter's view, is a violation of the pain management agreement, can be viewed as detracting from the credibility or the continued vitality of Dr. Walter's July 28, 2005 certification of TTD. *Page 22 
 {¶ 63} Dr. Walter's July 28, 2005 C-84 lists "shoulder, neck back pain" as the subjective clinical findings that premise his TTD certification.
 {¶ 64} If relator is using illegal substances that detract from the management of his pain that is the basis for Dr. Walter's disability certification, then the commission can validly conclude that Dr. Walter's disability certification is undermined. Thus, the magistrate concludes that the commission did not abuse its discretion in denying compensation on that basis.
 {¶ 65} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1